## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("Agreement") is entered into on October 1, 2014, by and between **Arc Welding Supply Co., Inc.** an Indiana corporation ("Seller"), and **Charles R. McCormick** ("Stockholder"), and **American Welding & Gas, Inc.** a North Carolina corporation ("Purchaser").

## RECITALS

**WHEREAS**, Seller and Stockholder are engaged in the cylinder gases, propane, and welding products business under the corporate name of Arc Welding Supply Co., Inc. with its sole business location at 2019 S. Old Decker Rd., Vincennes, IN 47591; and

**WHEREAS**, Stockholder owns 100% of the issued and outstanding shares of Seller; and

**WHEREAS**, Purchaser desires to purchase certain operating assets of Seller's cylinder gases, propane, and welding products business (the "Business") including, but not limited to, the trade name, customer list, customer contracts, inventory, fixed assets and collectible trade accounts receivable of the Business, and the Seller desires to sell, transfer and assign such assets to Purchaser, all upon the terms, conditions and agreements herein contained.

**NOW, THEREFORE**, in consideration of the premises and the respective representations, warranties, covenants, agreements and indemnities contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, each intending to be legally bound, agree as follows:

## ARTICLE 1
## ASSETS PURCHASED

SECTION 1.1 Purchased Assets.  Seller agrees to sell, convey, transfer, and deliver to Purchaser, as of the Effective Date, (as defined in Section 4.1) the assets and property which are used in the Business as set forth below (collectively, the "Purchased Assets"):

(a)     the Asset Cylinders used in the Business and located at the Seller's store location or at the premises of the customers of the Business, including but not limited to those set forth on Schedule 1.1(a).  For purposes of this Agreement, the "Asset Cylinders" shall mean gas cylinders, liquid cylinders, propane cylinders, cryogenic cylinders, tanks, and dewars, including dock stock and rental cylinders. Cylinder rent accounts not being paid will reduce the cylinder count unless the cylinder is retrieved;

(b)     all machinery, equipment (including forklifts), Asset Cylinder pallets, bulk tanks, supplies (including office supplies), tooling, trade fixtures, furniture and office equipment, computers, monitors, data and software, in each case as used in the Business as set forth on Schedule 1.1(b) (collectively, the "Equipment");

(c)     to the extent transferable, all rights in connection with prepaid expenses with respect to the Purchased Assets, as set forth on Schedule 1.1(c);

(d)     all good and saleable inventory held for use in the Purchased Business, as set forth on <u>Schedule 1.1(d)</u> (collectively, the "<u>Inventory</u>");

(e)     to the extent assignable, all rights against suppliers and manufacturers under warranties or otherwise covering any of the Purchased Assets ( the "<u>Warranties</u>");

(f)     Seller's customer list pertaining to the Business and all associated customer contracts with respect to the provision of cylinder gases and welding products hardgoods, including but not limited to those set forth on <u>Schedule 1.1(f)</u> (the "<u>Customer List</u>");

(g)     all leasehold interests created by Personal Property Leases used primarily in connection with the Business under which Seller is a lessee, as set forth on <u>Schedule 1.1(g)</u> (the "<u>Personal Property Leases</u>");

(h)     all Permits (as defined in <u>Section 5.15</u>) in favor of Seller relating to the Business, to the extent that such Permits may be assigned;

(i)     all vehicles and trucks as the same are listed and more completely described by manufacturer, model name and number, model year, and description on <u>Schedule 1.1(i)</u> (collectively, the "<u>Motor Vehicles</u>");

(j)     all phone numbers, fax numbers, cell phone numbers, web addresses, e-mail addresses and web sites assigned to and used in the Business;

(k)     all of Seller's right, title and interest in and to the name Arc Welding Supply Co., Inc. and all derivatives thereof;

(l)     unlimited perpetual access to all cylinder ledgers and gas history records of customers of the Business;

(m)     Receivables as set forth in <u>Section 2.1(a)</u>;

(n)     Contracts which includes Customer Contracts and other contracts incidental to the operation of the Business which are listed on <u>Schedule 1.1(n)</u>; and

(o)     It is specifically recognized and understood by the parties that the Purchaser is not acquiring any title or interest in the personal property or assets that are listed on <u>Schedule 1.1(o)</u> (all collectively referred to as the "<u>Excluded Assets</u>").

SECTION 1.2   <u>Real Property</u>.  As a condition to closing under this Agreement:

(a)     Purchaser must enter into an agreement to lease or sublease the real estate located at 2019 S. Old Decker Rd., Vincennes, IN 47591 (the "<u>Business Premises</u>") upon terms and conditions that are satisfactory to Purchaser in Purchaser's sole discretion (<u>Schedule 1.2</u>)

**ARTICLE 2**
**CONSIDERATION, ALLOCATION AND PAYMENT**

SECTION 2.1 <u>Purchase Price</u>.  In consideration of the transfer of the Purchased Assets hereunder, Purchaser shall pay to Seller the purchase price as provided in this <u>Section 2.1</u> (the "Purchase Price").  Specifically, the Purchase Price will be the aggregate of the following:

(a)     <u>Receivables</u>.   The total of Seller's collectible accounts receivable listed on <u>Schedule 2.1(a)</u> on a guaranteed basis as described below (referred to as the "<u>Receivables</u>").  An estimate of the Receivables shall be described by customer and valued on the List of Receivables in <u>Schedule 2.1</u>.  The List of Receivables will reflect a write off by Seller of any Receivables that Seller knows are un-collectible or that are mutually determined by Seller and Purchaser to be non-performing and unproductive.  The Purchaser reserves the right not to purchase any Receivable which has a portion of its balance more than 60 days past due.  Any such un-collectible Receivable or rejected Receivable shall not be transferred to Purchaser but shall remain with Seller for collection.  Receivables shall be valued at the face amount less applicable discounts and rebates, including but not limited to discounts for prompt payment.

Purchaser and Seller shall jointly notify all customers on the Customer List (<u>Schedule 1.1(f)</u>) of the change in ownership of the Purchased Assets.  All collections (except COD payments and payments by customers who pay by invoice) will be applied to the applicable customer's outstanding balances in order starting with the oldest such balance.  On COD Payments, payments shall be applied to the COD invoices first then to the oldest balance.  Purchaser shall use reasonable collection efforts consistent with Purchaser's past business practices, provided that Purchaser shall not be required to institute litigation or any third party collection effort to collect the Receivables.  Seller will fully cooperate with Purchaser to maximize collections of Receivables.

Purchaser shall defer payment of 20% of the List of Receivables (<u>Schedule 2.1(a)</u>) for 100 days (the "<u>Receivables Deferred Payment</u>") against which any uncollected Receivables from the List of Receivables shall be charged.  At the end of the 100-day period, any uncollected Receivable will be offset against the Receivables Deferred Payment.  Any unused portion of the Receivables Deferred Payment shall be paid to the Seller plus interest at **4% per annum** from Effective Date to date of settlement.  The total of the List of Receivables less the Receivables Deferred Payment will be paid by Purchaser to Seller at Closing.

Collectible accounts receivable is estimated by Seller to be $219,245.00.

(b)     <u>Inventory</u>.  The portion of the Purchase Price attributable to Inventory shall be determined as follows:  The Inventory shall be by physical count observed and supervised by personnel of both Purchaser and Seller.  Inventory procedures shall be mutually agreed upon by the Representatives of Purchaser and Seller.  **Ron Adkins** shall be the representative of Purchaser, and **Buck McCormick** shall be

the representative of the Seller (collectively, the "Representatives").

Only items of "Eligible Inventory" shall be included on the list of Inventory – Schedule 1.1(d).

    (i)    "Eligible Inventory" **shall include** only those items of inventory which:

    (1)    are in good, salable condition,

    (2)    are listed on manufacturers' current price lists,

    (3)    not out of date based on manufacturer date of use recommendations.

    (ii)    "Eligible Inventory" **shall not include** the following:

    (1)    any products containing asbestos,

    (2)    any merchandise or line of merchandise that has not been maintained and promoted for immediate sale by Seller or that has become outdated or been discontinued by the manufacturer,

    (3)    any warranty items not covered by the manufacturer's warranty eligibility policy,

    (4)    any products or merchandise on consignment to Seller, and

    (5)    any product that has not displayed active sales transactions in the last 12 months.  The parties may by mutual agreement include selected "no sale" items in Eligible Inventory.  Such items are to be valued by agreement of the Representatives.

Any inventory not constituting Eligible Inventory shall be retained by the Seller and shall be removed by Seller from the Business premises no later than thirty (30) days following Closing Date.  Inventory items so retained by the Seller may be sold or disposed of without violation of the covenant not to compete provided herein.

Eligible Inventory will be valued at Seller's acquisition cost net of all applicable discounts and rebates.  Seller will supply a listing of the Inventory by supplier and product line to Purchaser in effect at the date of the physical inventory count.

The total of the List of Eligible Inventory will be paid by Purchaser to Seller at Closing.

(c)    Covenant Not to Compete – Seller.  Effective at Closing, the Seller shall be bound by the provisions of Schedule 2.1(c).  The consideration for the Seller shall be the

execution, fulfillment and Closing of this Agreement.

(d)     **[INTENTIONALLY LEFT BLANK.]**

(e)     <u>Fixed Assets & Asset Cylinders</u>.  The Purchase Price attributable to fixed assets and asset cylinders consisting of Equipment as defined in <u>Section 1.1(b)</u>, Motor Vehicles, as defined in <u>Sections 1.1(i)</u>, and Asset Cylinders as defined in <u>Section 1.1(a)</u> will be $603,905.00, and will be paid by Purchaser to Seller at Closing.

(f)     <u>Asset Cylinders</u>.  The Asset Cylinders in the possession of Seller and in possession of customers shall be counted and verified as part of the inventory under <u>Section 2.1(e)</u>, above.  The base number of Asset Cylinders is 6,500 units. The parties agree that the Asset Cylinders will not be verified to the satisfaction of the Purchaser prior to Closing, therefore, $150,000.00 of the Purchase Price shall be deferred for 180 days (the "<u>Cylinder Deferred Payment</u>").  After the 180 day cylinder reconciliation period, any shortage of Asset Cylinders shall be charged at the rate of $125.00 per unit against the Cylinder Deferred Payment, and any excess of Asset Cylinders will be added at the rate of $125.00 per unit to the Cylinder Deferred Payment.  The balance of the Cylinder Deferred Payment, if any, shall be paid to the Seller plus interest at **4% per annum** from the Effective Date to date of settlement.  Settlement of the Cylinder Deferred Payment shall take place not more than fifteen (15) days following the end of the cylinder reconciliation period.  For all accounts that indicate rental is not being paid, the related cylinders shall be excluded from the Asset Cylinders schedule.  All steel, type E, type D and type M6 cylinders shall be excluded from the Asset Cylinder count beyond what is rented or in use (valued at $35.00).

SECTION 2.2     <u>Allocation of Purchase Price</u>.  Said Purchase Price shall be allocated among the Assets in accordance with the determination of the amount of the Purchase Price in <u>Section 2.1</u> as determined by the Representatives, and the parties agree to use such allocation for all purposes and to assist each other as reasonably requested in the preparation of IRS Form 8594.

SECTION 2.3     <u>Payment of Purchase Price</u>.  At Closing, an amount equal to the Purchase Price determined in accordance with the provisions of <u>Section 2.1</u>, above, adjusted as provided in ARTICLE 2 and ARTICLE 3 (based upon the best information available to the parties at the time) shall be paid by wire transfer from the Purchaser to Seller.

**At least 72 hours prior to Closing, Seller shall provide to Purchaser the wiring instructions for the payment of the purchase price due at Closing.**

At or before Closing the Seller shall pay all long-term debt, bank notes payable, accounts payable, secured creditors and any other current liabilities that could or already have a lien or encumbrance on the Purchased Assets.

# ARTICLE 3
## ASSUMPTION OF LIABILITIES

Purchaser is not assuming any liabilities of Seller other than the following (collectively, the "Assumed Liabilities"), which Purchaser agrees to pay, perform and discharge when due and for which with respect to (a) below Purchaser shall receive a credit at Closing:

(a)     sick leave earned but not paid, annual leave earned but not paid, and bonuses earned but not paid to all employees of Seller who are employed by Purchaser after Effective Date (Schedule 3(a));

(b)     Liabilities of Seller under all the Personal Property Leases, provided such leases can be assigned to Purchaser on terms satisfactory to Purchaser, as they pertain to the Purchased Assets after the Effective Date (Schedule 3(b));

(c)     Liability of Seller under any continuing Customer Contracts as they pertain to the Purchased Assets after the Effective Date (Schedule 3(c));

(d)     Liabilities of Seller under any Permits as they pertain to the Purchased Assets which are assigned or transferred to Purchaser after the Effective Date (Schedule 3(d)).

# ARTICLE 4
## CLOSING

SECTION 4.1 Effective Date and Closing Date.  The purchase and sale contemplated by this Agreement shall be effective at 12:01am on October 1, 2014 (the "Effective Date").  All business transacted at or after 12:01am on October 1, 2014, shall be for the benefit of the Purchaser.  The Closing of the purchase and sale contemplated by this Agreement shall be held at such place as the parties agree, on October 1, 2014, at 2:00 p.m. or at such other date and time as the parties may agree (the "Closing Date").

SECTION 4.2 Apportionment.  Seller is entitled to all benefits and is responsible for all expenses and detriments through 12:01am on the Effective Date.  Purchaser is entitled to all benefits and is responsible for all detriments from and after 12:01am on the Effective Date.  On or before 100 days following Closing, Purchaser and Seller shall true up any amounts that owed based upon the apportionment principles set forth in this Section and in accordance with GAAP with respect to the Purchased Assets and Assumed Liabilities.  Such amounts to be applied as adjustments to the Purchase Price or paid on demand by Seller and Purchaser, as the case may be.

# ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF SELLER AND STOCKHOLDER

Seller and Stockholder, jointly and severally, make the representations and warranties set forth in this ARTICLE 5 to Purchaser.  For purposes of this Agreement, "Knowledge" means, with respect to any matter in question, the actual knowledge (after reasonable investigation or

inquiry) of (i) the Stockholder, or (ii) any individual who is serving, or who has at any time served, as a manager, director, or officer of Seller.

SECTION 5.1  <u>Organization and Good Standing</u>.  Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Indiana with full corporate power and authority to own and operate the Purchased Assets and to conduct the Business as the Purchased Assets are now owned and operated and as the Business is now conducted.  Seller has all requisite corporate power and authority to execute, deliver and perform this Agreement and to consummate the transactions contemplated hereby.  Seller is qualified to do business in the States of Indiana, and all other states in which it now conducts business.

SECTION 5.2  <u>No Violations; No Consents</u>.  The execution, delivery and performance by the Seller of this Agreement and each of the other Related Agreements to which Seller is a party, and the consummation of the transactions contemplated hereby and thereby, will not: (i) violate any provision of the Articles of Incorporation or Bylaws of Seller,  (ii) violate or conflict with any law, regulation, judgment, order, writ, injunction or decree of any court or governmental body of any jurisdiction applicable to Seller, or (iii) violate or conflict with, result in the breach or termination of, or otherwise give any other contracting party the right to terminate, or constitute a default (or an event which, with the lapse of time, or the giving of notice, or both, would constitute a default) or accelerate maturities under any agreement, contract, instrument, indenture, mortgage, deed of trust, or other document or restriction to which Seller is a party or by which any of the Purchased Assets are bound, subject to Seller obtaining all necessary approvals and/or assignments for any leases and contracts.

SECTION 5.3  <u>Validity of Agreement</u>.  The execution, delivery and performance by Seller of this Agreement and each of the other Related Agreements to which Seller is a party, and the consummation of the transactions contemplated hereby and thereby have been duly authorized and approved by all requisite corporate action on the part of Seller.  This Agreement and each of the other Related Agreements to which Seller is a party have been duly executed and delivered by Seller and are the legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their terms, subject to the effect of bankruptcy, insolvency, reorganization, or other similar laws affecting the rights and remedies of creditors generally and subject to general principles of equity.

SECTION 5.4  <u>Financial Statements</u>.  The Financial Statements as of December 31, 2013, and other dates, provided by Seller to Purchaser presents fairly, in all material respects, the profits and losses of the Business for the period referenced therein, subject to the assumptions, notes, qualifying comments and schedules in or attached to the Financial Statement.

SECTION 5.5  <u>Cylinder Deposits</u>.  All Cylinder Deposits from customers held by Seller and properly documented as of September 30, 2014 will be listed on <u>Schedule 5.5</u>.

SECTION 5.6  <u>Absence of Changes</u>.  Except as and to the extent set forth on <u>Schedule 5.6</u>, since December 31, 2013, there has not been any:

(a)  change which would result in a Material Adverse Effect.  A "<u>Material Adverse Effect</u>" shall mean any change, effect or circumstance that (i) is materially

adverse to the Purchased Assets or financial condition or results of operations of the Business of Seller (provided, however, that for purposes of determining whether there has been a "Material Adverse Effect" with respect to Seller (A) any adverse change resulting from or relating to general business or economic conditions affecting the economy as a whole shall be disregarded, (B) any adverse change resulting from or relating to conditions generally affecting the industries in which Seller or their customers or suppliers compete or participate shall be disregarded and (C) any adverse change resulting from or relating to the announcement, disclosure or pendency of the transactions contemplated by this Agreement shall be disregarded, or (ii) would prevent Purchaser or Seller, as the case may be, from carrying out its obligations under this Agreement.

(b)     damage, destruction or loss (whether or not covered by insurance) of any of the Purchased Assets which could have a Material Adverse Effect;

(c)     failure to operate the Business in the ordinary course so as to use reasonable efforts to preserve the Business intact and to preserve the the suppliers, customers and others having business relations with Seller in connection with the Business; and

(d)     agreement, whether oral or written, by Seller to do any of the foregoing.

SECTION 5.7  Condition of and Title to Purchased Assets.

(a)     Except for the Personal Property Leases, as defined in Section 5.8, and Permits, as defined in Section 5.14, which are being transferred by assignment pursuant to this Agreement or as otherwise set forth on Schedule 5.7, and the excluded assets as shown on Schedule 1.1(m), Seller owns all of the Purchased Assets and will transfer them to Purchaser free and clear of any liens, encumbrances, escrows, rights of first refusal, charges, pledges, options, mortgages, deeds of trust, security interests, claims, indentures, licenses, security agreements, restrictions (whether on sale, transfer, disposition, or otherwise), easements, defects of title, irregularities of title or other imperfection of title of every type and description, whether imposed by law, agreement, understanding, or otherwise ("Encumbrance").  Upon delivery to Purchaser of the Bill of Sale, Assignment and Assumption Agreement and other instruments of conveyance with respect to the Purchased Assets as provided in this Agreement, Purchaser will acquire good and marketable title to the Purchased Assets, free and clear of any Encumbrances. The Purchased Assets are in good and operating condition, reasonable wear and tear excepted; however, SELLER MAKES NO WARRANTIES, EXPRESSED OR IMPLIED, AS TO THEIR SUITABILITY FOR USE FOR A PARTICULAR PURPOSE.

(b)     All of the Purchased Assets are in the possession of Seller or its customers and, to the best of Seller's Knowledge, if in the possession of customers, are held pursuant to binding agreements obligating the customers to return or reimburse Seller for such property.

SECTION 5.8 <u>Personal Property Leases</u>.  Seller has made available to Purchaser copies of all material Personal Property Leases, including without limitation all amendments and supplements, side letters, or other instruments with the lessor affecting the obligations of Seller, as lessee, under said Personal Property Leases.  All rent and other sums and charges payable under all Personal Property Leases are current.  Except as set forth in <u>Schedule 5.8</u>, Seller represents and warrants that (i) all of the Personal Property Leases are in full force and effect and constitute legal, valid, and binding obligations of the Seller and, to the best of Seller's Knowledge, the other respective parties thereto; (ii) no material defaults by Seller exist with respect to any Personal Property Lease thereunder by Seller or, to the best of Seller's Knowledge, by any other party thereto; and (iii) no event has occurred which, with the giving of notice or the lapse of time or both, would constitute a default thereunder by Seller or, to the best of Seller's Knowledge, by any other party thereto.

SECTION 5.9 <u>Litigation</u>.  Except as set forth on <u>Schedule 5.9</u>, there are no actions, suits, or other proceedings pending or, to the best of Seller's Knowledge, threatened against Seller involving any of the Purchased Assets or the Business, at law or in equity or before or by any court or governmental authority or any board of arbitration or similar entity.

SECTION 5.10 <u>Tax Matters</u>.

(a)     All Taxes (for purposes of this Agreement, "<u>Taxes</u>" or "<u>Tax</u>" shall mean all taxes, charges, imposts, tariffs, fees, levies or other similar assessments or governmental charges of any kind whatsoever, including without limitation income taxes, ad valorem taxes, excise taxes, withholding taxes or other taxes of or with respect to gross receipts, premiums, real property, personal property, windfall profits, sales, use, transfers, licensing, employment, payroll and franchises imposed by or under any law, and such terms shall include any interest, fines, penalties, assessments or additions to tax resulting from, attributable to or incurred in connection with any such tax or any contest or dispute thereof) due from Seller with respect to the Business (except where such claims are being contested), for all periods ending on or before the Effective Date and the portion through the Effective Date of periods beginning before and ending after the Effective Date, have been fully paid or properly accrued by Seller.  No deficiency or adjustment in respect of any Tax that was assessed against Seller that might result in an Encumbrance on any of the Purchased Assets remains unpaid, except for any amounts being contested in good faith by appropriate proceedings, and no claim, assessment or audit is pending or, to the best of Seller's Knowledge, threatened with respect to any Taxes whose assessment might result in an Encumbrance on any of the Purchased Assets.

(b)     Except as set forth in <u>Schedule 5.10</u>, Seller has not received notice from any taxing authority that it is presently under any investigation or audit with respect to the Purchased Assets, nor has it received any notice of, any investigation or audit, by any state or local government concerning real estate and personal property taxes assessed with respect to the Purchased Assets.

SECTION 5.11 <u>Employees</u>.  <u>Schedule 5.11</u> contains a complete list of all of the current employees of Seller who are primarily employed in connection with the Business ("<u>Seller</u>

Employees") and, for each Seller Employee, his or her current title, exempt or non-exempt status, current annual base salary or wages, and date of hire.  Except as set forth on Schedule 5.11, none of the Seller Employees listed on Schedule 5.11 is a member of or is represented by any collective bargaining unit or is a party to any employment agreement with Seller.

SECTION 5.12  Environmental Compliance.  Except as set forth on Schedule 5.12, to the best of Seller's Knowledge, as of the date of this Agreement:

(a)     no unlawful levels of hazardous substances have been released by Seller at the Business Premises of the Business in quantities which would give rise to  liability against Seller in connection with the Business under applicable Environmental Laws.

(b)     Seller's use and occupancy of the Business Premises (as owner, tenant, lessee, or otherwise), has not done or caused to be done any act on or use of such property that would prevent such property from complying with all applicable environmental statutes, laws, rules, and regulations of all state, federal, local, and other applicable governmental and regulatory authorities, agencies, and bodies, and all such applicable statutes, laws, rules, and regulations having to do with toxic or hazardous wastes or materials, including, but not limited to, the Federal Clean Air Act, the Federal Water Pollution Control Act, the Comprehensive Environmental Response, and Compensation, and Liability Act of 1980, the Resource Conservation and Recovery Act, the Oil Pollution Act of 1990, the Hazardous Materials Transportation Act, the Clean Water Act, the Toxic Substances Control Act, the Emergency Planning and Community Right to Know Act, the Safe Drinking Water Act, and the Occupation Safety and Health Act, including the local or state equivalents of these laws, as any of the foregoing may be amended from time to time ("Environmental Laws").

(c)     Seller has not received written notice from any governmental authority or any third party alleging a material violation of or liability under applicable Environmental Laws affecting the Business Premises;

(d)     Seller is not the subject of any investigation, response or corrective action undertaken by, or under the direct oversight of, a governmental authority relating to the release of any hazardous substance at the Business Premises; and

(e)     The Business Premises is not subject to any outstanding written order or agreement with any governmental authority relating to any actual or potential violation of or liability under any Environmental Laws.

SECTION 5.13   Contracts; No Defaults.   True and correct copies of each written agreement with customers, suppliers, and service providers as to price, volume, or other commitments pertaining to the Purchased Assets (the "Assigned Contracts") have been delivered to Purchaser.  Except as set forth on Schedule 5.13, to the best of Seller's Knowledge, no condition exists or event has occurred which, with notice or lapse of time or both, would

constitute a material default or a basis for force majeure or the claim of excusable delay or nonperformance under such Assigned Contracts.

SECTION 5.14  Permits and Licenses.  Except as set forth on Schedule 5.14, and except to the extent that the failure of any of the following representations to be true could not reasonably be expected to have a Material Adverse Effect, (i) Seller has all permits, licenses, certificates and authorities from Governmental Authorities required to conduct the Business as it is now being conducted (collectively, the "Permits"), (ii) the consummation of the transactions contemplated by this Agreement will not constitute a violation of any Permit or give a governmental authority the right to revoke, withdraw, suspend, cancel, terminate or modify any such Permit, (iii) such Permits are in full force and effect unimpaired by any act or omission of Seller and have not been suspended or revoked, and (iv) Seller has complied with the terms and has taken all actions necessary to renew and maintain in effect such Permits.

SECTION 5.15  Compliance with Law.  Except as set forth on Schedule 5.15, with respect to the ownership of the Purchased Assets and the conduct of the Business, to the best of Seller's Knowledge, Seller has complied with all applicable laws, rules and regulations of Governmental Authorities.

SECTION 5.16  Uniform Fraudulent Transfers Act.  Seller and Stockholders warrant that the sale of the Purchased Assets is for consideration which is of reasonably equivalent value, and the sale is conducted in good faith.  Seller and Stockholders further warrant that the sale of Purchased Assets is not voidable under the Uniform Fraudulent Transfers Act.

SECTION 5.17  Disclaimer of Additional and Implied Warranties.  SELLER IS MAKING NO REPRESENTATIONS OR WARRANTIES, EXPRESSED OR IMPLIED, OF ANY NATURE WHATSOEVER EXCEPT AS SPECIFICALLY SET FORTH IN ARTICLE 5 OF THIS AGREEMENT.

## ARTICLE 6
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller as follows:

SECTION 6.1  Organization and Good Standing.  Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of North Carolina. Purchaser has full corporate power and authority to conduct its Business as now being conducted, and to own or lease and operate its respective properties, and has all requisite corporate power and authority to execute and perform this Agreement and the transactions contemplated hereby.

SECTION 6.2  No Violations; No Consents.  The execution, delivery and performance by Purchaser of this Agreement and each of the other Related Agreements to which Purchaser is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not (i) violate any provision of the Articles of Incorporation or Bylaws of Purchaser, (ii) violate or conflict with any law, regulation, judgment, order, writ, injunction or decree of any court or governmental body of any jurisdiction applicable to Purchaser, or (iii) violate or conflict with, result in the breach or termination of, or otherwise give any other contracting party the

right to terminate, or constitute a default (or an event which, with the lapse of time, or the giving of notice, or both, would constitute a default) or accelerate maturities under any agreement, contract, instrument, indenture, mortgage, deed of trust, or other document or restriction to which Purchaser is a party or by which any of the assets or properties of Purchaser is bound.

SECTION 6.3   Validity of Agreement.   The execution, delivery and performance by Purchaser of this Agreement and each of the other Related Agreements to which Purchaser is a party, and the consummation of the transactions contemplated hereby and thereby have been duly authorized and approved by all requisite corporate action on the part of Purchaser.   This Agreement and each of the Related Agreements to which Purchaser is a party have been duly executed and delivered by Purchaser and are the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their terms, subject to the effect of bankruptcy, insolvency, reorganization, or other similar laws affecting the rights and remedies of creditors generally and subject to general principles of equity.

SECTION 6.4   Litigation and Solvency.   There is no litigation against the Purchaser that is not covered by insurance that has been filed before Closing, there are no judgments outstanding and furthermore the Purchaser is solvent with sufficient cash and assets to close the transaction contemplated by this Agreement.

SECTION 6.5   Miscellaneous.   There are no known breaches by Purchaser of this Agreement and Purchaser is unaware of any negative material changes in its operating conditions between December 31, 2013 and Closing.

## ARTICLE 7
## COVENANTS

SECTION 7.1   Conduct of Business Pending the Closing.   After the date hereof and prior to the Effective Date, unless otherwise provided in this Agreement or unless Purchaser shall otherwise agree in writing, Seller, as such relates to the Purchased Assets or the Business, shall:

    (a)    conduct the Business in the ordinary and usual course of the Business and consistent with past practice and will maintain sales volume, gross profit, expenses, and net assets, excluding cash, in proportion with previous twelve month operations plus or minus ten percent (10%);

    (b)    not (1) make any acquisition of any assets or business in connection with the Business, other than expenditures for inventory in the ordinary course of the Business and except for capital expenditures referenced in Section 7.1(d), (2) sell, pledge, dispose of or encumber any Purchased Assets, other than sales of inventory or equipment in the ordinary course of business or (3) enter into any contract, agreement, commitment or arrangement with respect to either of the foregoing;

    (c)    not enter into or assume any contracts or agreements outside of the ordinary course of business on account of the Business;

(d)  not make or commit to make any capital expenditures with respect to the Business, except for capital expenditures in the ordinary course of the Business not in excess of $10,000 individually or $25,000 in the aggregate;

(e)  continue to manage the working capital of the Business in a reasonable manner consistent with its past practice;

(f)  not accept advance payments from Customers of the Business, except in the ordinary course of business, or pre-invoice for products sold or services rendered by Seller, except for Cylinder deposits;

(g)  except as otherwise requested by Purchaser, and without making any commitments on Purchaser's behalf, use commercially reasonable efforts in the ordinary course of business to preserve its relationships with its suppliers, customers and others having business relations with it; and

(h)  not increase the compensation of any employee of the Business prior to the Effective Date without the prior written consent of Purchaser.

SECTION 7.2  Access to Information.

(a)  Seller and Shareholder shall afford to Purchaser and its accountants, counsel, financial advisors and other representatives (the "Purchaser Representatives") reasonable access during normal business hours throughout the period prior to the Effective Date to all of its respective properties, contracts, personnel, books and records related to the Purchased Assets and Business, as Purchaser shall reasonably request, and during such period shall furnish to Purchaser all such additional information concerning the Purchased Assets and the Business as Purchaser shall reasonably request.

(b)  Seller and Shareholder grants to Purchaser Representatives, such access to the Business Premises (whether owned, operated, or leased), personnel and records as Purchaser may reasonably request for purposes of conducting environmental site assessments ("Environmental Due Diligence"). Purchaser shall provide to Seller upon receipt thereof by Purchaser copies of any and all reports of environmental assessments, sampling and/or analysis conducted by or for Purchaser so that Seller may review such reports and comment to Purchaser and its consultant on the content of the reports before they are placed in final form.

SECTION 7.3  Agreement to Cooperate.  Subject to the terms and conditions herein provided, until the Effective Date each of the parties hereto shall use all reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement, including using its reasonable efforts to obtain all necessary, proper or advisable waivers, consents and approvals of third parties required in order to preserve material contractual relationships of Seller.

SECTION 7.4   Confidentiality.   Each party will maintain in confidence, and cause its directors, officers, employees, agents and advisors to maintain in confidence, and not use to the detriment of the other party any written, oral or other information obtained in confidence from the other party in connection with this Agreement, including price and other terms, or the transactions contemplated hereby unless (i) such information is already known to such party or to others not bound by a duty of confidentiality, (ii) such information becomes publicly available through no fault of such party, (iii) such information is necessary or appropriate in making any filing or obtaining any consent or approval required for the consummation of the transactions contemplated hereby, or (iv) the furnishing or use of such information is required by any proceeding.   In the event that Purchaser or Seller is at any time requested or required (by oral questions, interrogatories, request for information or documents, subpoena or other similar process) to disclose any information supplied to it in connection with this transaction, such party agrees to provide the other party hereto prompt notice of such request so that an appropriate protective order may be sought and/or such other party may waive the first party's compliance with the terms of this Section 7.4.   If the transactions contemplated by this Agreement are not consummated, each party will, within ten (10) days of receipt of request, return or destroy all information received or derived from information obtained by the other party and will certify to the other as to the compliance with this provision.

## ARTICLE 8
## ADDITIONAL AGREEMENTS

SECTION 8.1   Assignment Consents.   Seller shall obtain prior to the Closing Date all necessary consents for the assignment of all Personal Property Leases and Assigned Contracts.

SECTION 8.2   Title and Risk of Loss.   Title to all of the Purchased Assets and all risks relating to the Purchased Assets, including without limitation the risk of damage, theft or other loss, shall pass to Purchaser at the time of Closing.

SECTION 8.3   Disclosure Schedule.   The Seller may, from time to time through the Closing Date, advise the Purchaser as to any change, amendment or supplement to the schedules which is necessary to reflect a change in the subject matter thereof occurring through the Effective Date.   The Purchaser must notify the Seller in writing within five (5) business days after receipt of any such change, amendment or supplement to the schedules of its election to terminate this Agreement; provided, that Seller may avoid any such termination by notifying the Purchaser in writing within five (5) business days after Seller's receipt of a Termination Notice of Seller's withdrawal of such change, amendment or supplement to the schedules.   If the Purchaser fails to notify Seller within the time period set forth above, Purchaser shall be deemed to have waived its right to terminate this Agreement based on such change, amendment or supplement to the schedules and such change, amendment or supplement shall be incorporated into the schedules.

SECTION 8.4   Employment of Seller's Employees.   Purchaser is under no obligation to employ or offer employment to any of Seller's current employees other than Charles R. "Buck" McCormick.   Any of Seller's current employees who are extended offers of employment by Purchaser shall be employed "at will" without any obligation of Purchaser to employ such employees for any specific period of time.   Before Closing, Seller shall have delivered to

Purchaser a true and complete schedule listing all persons currently employed by Seller, the nature of each employee's job, years of service, the amount or rate of compensation, all accruals of compensation, bonuses, vacation pay, sick leave, and all other pay or benefits due each such employee (Schedule 3(a)). Seller shall comply with Purchaser's reasonable requests for supplemental information therefore.

SECTION 8.5  Related Agreements. The parties acknowledge and agree to execute and deliver, on the Closing Date, the following documents (the "Related Agreements") which are directly related to the transaction contemplated by this Agreement:

(a)     The Lease Agreement in the form of Schedule 1.2 attached hereto;

(b)     The Purchaser and Stockholder (executing individually) ASSET PURCHASE AGREEMENT for the sale of Stockholder's personal goodwill arising from its reputation, expertise and personal relationships with customers and vendors. Additionally, this Agreement is contingent on the Stockholder executing Non-Compete, Non-solicitation and Confidentiality Agreement providing the Purchaser with a reasonable period of time for a meaningful transference of Stockholder's personal goodwill; and

(c)     The other agreements and documents (i) referenced in this Agreement to which the parties are to enter or (ii) reasonably necessary for the parties to execute to consummate the transaction contemplated by this Agreement.

## ARTICLE 9
## CONDITIONS TO CLOSING

SECTION 9.1    Conditions to Each Party's Obligation to Close.   The respective obligations of each party to close the transactions contemplated hereby shall be subject to the fulfillment or waiver, if permissible, of the following conditions on or prior to the Closing Date:

(a)     no preliminary or permanent injunction or other order or decree by any federal or state court which prevents the consummation of the transactions contemplated hereby shall have been issued and remain in effect (each party agreeing to use its reasonable efforts to have any such injunction, order or decree lifted); and

(b)     no action shall have been taken, and no statute, rule or regulation shall have been enacted, by any state or federal government or governmental agency in the United States which would prevent the consummation of the transactions contemplated hereby or make them illegal.

SECTION 9.2  Conditions to Obligation of Seller to Close. Unless waived by Seller, the obligation of Seller to close the transactions contemplated hereby shall be subject to the fulfillment on or prior to the Closing Date of the following additional conditions:

(a)     Purchaser shall have performed in all material respects (or in all respects in the case of any agreement containing any materiality qualification) its agreements contained in this Agreement required to be performed on or prior to the Closing

Date;

(b)     The representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects (or in all respects in the case of any representation or warranty containing any materiality qualification) on and as of the date made and on and as of the Closing Date as if made at such date;

SECTION 9.3   Conditions to Obligations of Purchaser to Close.   Unless waived by Purchaser, the obligations of Purchaser to close the transactions contemplated hereby shall be subject to the fulfillment on or prior to the Closing Date of the additional following conditions:

(a)     Seller and Stockholder shall have performed in all material respects (or in all respects in the case of any agreement containing any materiality qualification) its agreements contained in this Agreement required to be performed on or prior to the Closing Date.

(b)     The representations and warranties of Seller and Stockholder contained in this Agreement shall be true and correct in all material respects (or in all respects in the case of any representation or warranty containing any materiality qualification) on and as of the date made and on and as of the Closing Date as if made at such date.

(c)     Purchaser shall have received a certificate executed on behalf of the Seller by an appropriate officer of the Seller (i) confirming the matters in Section 9.3(a), (b) and (f), and (ii) acknowledging that Seller has no knowledge of any breach or inaccuracy as of the Closing Date of any representation or warranty of Purchaser set forth in this Agreement or the schedules hereto.

(d)     Purchaser shall have obtained assurance to its satisfaction that Charles R. "Buck" McCormick will become an employee of Purchaser after the Closing.

(e)     The completion of building lease for the Business Premises on terms acceptable to Purchaser is an integral part of the transaction contemplated by this Agreement. If building lease agreement for the Business Premises cannot be made acceptable to Purchaser by the Effective Date, then this Agreement shall be null and void.

(f)     There shall be no material adverse change in the Purchased Assets or the Business.

(g)     Seller and Stockholder prior to or at Closing shall provide to Purchaser duly authorized and signed copies of all documents, schedules and exhibits called for under this Agreement.

**ARTICLE 10**
**INDEMNIFICATION**

SECTION 10.1   Seller's and Stockholder' Indemnity Obligations.   Subject to the provisions of ARTICLE 10, Seller and Stockholder, jointly and severally, shall indemnify and defend Purchaser and its shareholders, directors, officers, employees, affiliates and agents

(collectively, "Purchaser Group") and hold them harmless from and against any and all damages, causes of action, claims, deficiencies, losses, liabilities, penalties, payments, obligations, costs and expenses (including reasonable attorneys' fees) (collectively, "Damages") relating to or arising out of (i) any misrepresentation or breach of the representations or warranties in this Agreement by Seller or Stockholder, (ii) any non-satisfaction of any covenants or other obligations of Seller or Stockholder under this Agreement, (iii) the ownership or operation of the Business or the use of the Purchased Assets or the Business Premises prior to the Effective Date, (iv) failing to comply with any bulk sales laws, (v) any and all liabilities, claims against the Assets, the Business or any member of Purchaser Group whether or not related to the Business, whether fixed, contingent or otherwise, and whether known or unknown, which are related to Seller and Stockholder which are asserted or imposed on any member of Purchaser Group by any person other than Seller and Stockholder and (vi) the fees and expenses of any broker or finder retained by Seller, Stockholder, or any of their Affiliates ("Affiliate" shall mean, with respect to any person or other entity that, directly or indirectly, controls, is controlled by, or is under common control with, such person or other entity in question.  For the purposes of this definition "control" (including "controlling," "controlled by" and "under common control with") as used with respect to any person or other entity, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such person or other entity, whether through the ownership of voting securities, by contract or otherwise).

SECTION 10.2   Purchaser's Indemnity Obligations.   Subject to the provisions of ARTICLE 10, Purchaser shall indemnify and defend Seller and its shareholders, directors, officers, employees, affiliates and agents (collectively, "Seller Group") and hold them harmless from and against any and all Damages relating to or arising out of (i) any misrepresentation or breach of any of the representations or warranties in this Agreement by Purchaser, (ii) any non-satisfaction of any covenants or other obligations of Purchaser under this Agreement, (iii) the ownership or operation or use of the Purchased Assets after the Closing, including, without limitation, the Assumed Liabilities, and (iv) the fees and expenses of any broker or finder retained by Purchaser or any of its Affiliates.

SECTION 10.3   Notice and Defense of Indemnity Claims.   Claims asserted under Sections 10.1 or 10.2 are referred to herein as "Indemnity Claims."   The party obligated to indemnify another party hereunder is referred to herein as the "Indemnifying Party" and the party entitled to indemnification hereunder is referred to herein as the "Indemnified Party."   The following provisions shall apply:

(a)   Notice.   An Indemnified Party shall give prompt written notice to the Indemnifying Party of the assertion by the Indemnified Party or by a third party of any liability which the Indemnified Party has reason to believe might give rise to an Indemnity Claim; provided, however, that any failure to provide such prompt written notice shall limit the Indemnified Party's right to indemnification hereunder only if and to the extent that the Indemnifying Party is prejudiced by such failure.   Such notice shall set forth in reasonable detail the nature of such action or claim, and shall include a copy of any written complaint, summons, correspondence or other communication from the party asserting the claim or initiating the action.

(b)     <u>Defending Claims Involving Third Parties</u>.   As to any such Indemnity Claim which involves a third party, if the Indemnifying Party irrevocably agrees to indemnify the Indemnified Party, except with regard to third party claims involving a request for injunctive or equitable relief, the Indemnifying Party shall assume and thereafter control the defense of such Indemnity Claim. The Indemnified Party shall be entitled, together with the Indemnifying Party, to participate in the defense, compromise or settlement of any such matter through the Indemnified Party's own attorneys and at its own expense, but the Indemnifying Party shall have control thereof, and the Indemnified Party, at the expense of the Indemnified Party, shall provide such cooperation and such access to its books, records and properties as the Indemnifying Party shall reasonably request with respect to such third party claims. As to any Indemnity Claim which involves a third party claim with respect to which the Indemnifying Party does not assume the defense thereof or does not agree to indemnify the Indemnified Party, the Indemnified Party shall defend itself and shall control the defense thereof (but shall be entitled to make an indemnification claim against the Indemnifying Party with respect to all related reasonable costs and expenses).

(c)     <u>Settling Claims Involving Third Parties</u>.   The Indemnifying Party shall not make any settlement of any claims on behalf of the Indemnified Party, other than claims strictly for monetary damages as to which the Indemnifying Party agrees to be solely responsible, without the written consent of the Indemnified Party, which consent shall not be unreasonably withheld.   The Indemnified Party shall not make any settlement of any claims without the written consent of the Indemnifying Party; provided, that if the Indemnifying Party does not assume and control the defense of an Indemnity Claim which involves a third party, the Indemnified Party which defends and controls the defense thereof may settle such claim without waiving its right to indemnification from the Indemnifying Party.

SECTION 10.4  <u>Manner of Indemnification</u>.  The parties to this Agreement shall first enter into good faith direct discussions to settle any Indemnity Claims and all other claims relating to this Agreement. If such Indemnity or other claims cannot be amicably resolved after twenty one (21) days after either party requests in writing to enter into direct discussions then the parties shall have the option to institute an action to adjudicate such claim.

**ARTICLE 11**
**DELIVERIES AT CLOSING**

SECTION 11.1   <u>Closing</u>.  At the Closing, the parties shall deliver the documents, and shall perform the acts, which are set forth in this ARTICLE 11. All documents which Seller shall deliver shall be in form and substance reasonably satisfactory to Purchaser and its counsel.  All documents which Purchaser shall deliver shall be in form and substance reasonably satisfactory to Seller and its counsel.

SECTION 11.2   <u>Purchaser's Deliveries</u>.   Subject to the fulfillment or waiver of the conditions set forth herein, Purchaser shall execute and/or deliver to Seller all of the following:

(a)     Certificate of good standing or existence from the state of North Carolina;

(b)     Secretary's certified copy of the Purchaser's board resolution authorizing the transaction contemplated hereby.

(c)     the Purchase Price; and,

(d)     all other documents required from Purchaser to consummate the transaction contemplated hereby.

SECTION 11.3 <u>Seller's Deliveries</u>.   Seller shall make available to Purchaser physical possession of all of the Purchased Assets, and shall execute (where applicable in recordable form) and/or deliver or cause to be executed and/or delivered to Purchaser all of the following:

(a) a Bill of Sale, in accordance with <u>Schedule 11.3(a)</u>, conveying all of the Purchased Assets qualified to be transferred by a bill of sale (including without limitation the Eligible Inventory and Fixed Assets) to Purchaser, free and clear of all liens, claims, encumbrances and security interests and containing the warranties of title set forth in this Agreement, in a form acceptable to Purchaser, executed by Seller.   Seller shall also provide Purchaser with properly endorsed certificate of title or other original instruments (as applicable), free and clear of all liens, claims, encumbrances and security interests.

(b) an Assignment to Purchaser, in accordance with <u>Schedule 11.3(b)</u> executed by Seller in form acceptable to Purchaser of all of the Purchased Assets.

(c) Titles to all of the vehicles purchased endorsed to Purchaser.

(d) a Closing Certificate in accordance with <u>Schedule 11.3(d)</u> duly executed by Seller.

(e) To the extent obtainable, evidence of the release of all liens and other encumbrances and security interests in any of the Purchased assets including, without limitation, UCC-3 termination statements (if any) on the Purchased Assets.

(f) to the extent obtained, all necessary consents for the assignment of contracts, purchase orders, sales orders, and permits which are to be assigned to Purchaser or alternate arrangements with respect thereto, all as acceptable to Purchaser.

(g) Current Certificate of Good Standing issued by the Secretary Of State of the State of Indiana evidencing that Seller is in good standing.

(h) A duly authorized and signed resolution of Seller and certified by the Secretary of Seller authorizing Seller entering into the transactions contemplated herein in

accordance with <u>Schedule 11.3(h)</u>.

(i) Evidence of change of Seller's corporate business name (Arc Welding Supply Co., Inc.); and all other state, county and local forms fully completed and signed transferring to Purchaser all rights and interests in Seller's business and trade names.

(j)  without limitation by the specific enumeration of the foregoing, all other documents reasonably required from Seller to consummate the transaction contemplated hereby.

## ARTICLE 12
## MISCELLANEOUS

SECTION 12.1   <u>Survival of Representations and Warranties</u>.   The representations and warranties of the parties contained in this Agreement shall survive the Closing Date for a period of three (3) years; *provided, however*, that the representations and warranties contained in <u>Sections 5.3, 5.7, 5.9, 5.10, 5.12</u> and 6.2, <u>6.3, 6.4</u> and <u>6.5</u> shall survive indefinitely.   As a condition precedent to the rights of a party to (i) assert a claim with respect to any alleged misrepresentation or breach of warranty by the other party (other than any misrepresentation or breach of warranty under <u>Sections 5.3, 5.7, 5.9, 5.10, 5.12</u> or <u>6.2, 6.3, 6.4 and 6.5</u> of this Agreement) or (ii) to enforce the indemnification provision of ARTICLE 10 with respect to any such misrepresentation or breach of warranty, the party seeking to assert any such misrepresentation or breach of warranty or to enforce such indemnification must give notice to the other party within three (3) years following the Closing Date.

SECTION 12.2   <u>Expenses and Fees</u>.   Each of the parties hereto shall pay the fees and expenses of such party's respective counsel, accountants, other experts and any other expenses incurred by such party relating to the negotiation, preparation, execution and performance of this Agreement.

SECTION 12.3   <u>Governing Law and Venue</u>.   This Agreement shall be governed in all respects by the laws of the State of Indiana.   In the event of any action brought pursuant to the terms of the Agreement or as a result of the rights or obligations hereunder the parties waive trial by jury and agree to exclusive jurisdiction in United States District Court for the Southern District of Indiana, sitting in Evansville IN or the Circuit Court of Vandeburgh County, IN.

SECTION 12.4   <u>Headings</u>.   All headings contained in this Agreement are for reference only and shall not affect the meaning or interpretation of this Agreement in any manner.

SECTION 12.5   <u>Invalid Provisions</u>.   Should any provision of this Agreement for any reason be declared invalid, such decision shall not affect the validity of any other provisions of this Agreement, and all remaining provisions shall remain in full force and effect as if this Agreement had been executed with the invalid provisions thereof eliminated.

SECTION 12.6   <u>Binding Agreement</u>.   This Agreement shall be binding upon and inure to the benefit of each of the parties and their respective successors and permitted assigns; provided,

however, that neither this Agreement nor any right hereunder may be assigned by any party without the consent of the other party.

SECTION 12.7   <u>Written Notices</u>.   All notices pursuant to this Agreement shall be in writing.

(a)   <u>Notice to Seller</u>.   A notice to Seller shall be sufficient and deemed to have been received in all respects when (i) personally delivered, (ii) on the second day after mailing, by first class registered or certified mail, postage and fees prepaid, or (iii) on the second day after being sent by an established, reputable overnight courier service, addressed to the following or such other address as may be provided by written notice made pursuant to this Section:

to:         Charles R. "Buck" McCormick
            3367 North McCormick Road
            Vincennes, IL 47591

(b)   <u>Notice to Purchaser</u>.   A notice to Purchaser shall be sufficient and deemed to have been received in all respects when (i) personally delivered, (ii) on the second day after mailing, by first class registered or certified mail, postage and fees prepaid, or (iii) on the second day after being sent by an established, reputable overnight courier service, addressed to the following or such other address as may be provided by written notice made pursuant to this Section:

to:         American Welding & Gas, Inc.
            Attn: Corporate Administration
            4900 Falls of Neuse, Suite 150
            Raleigh, North Carolina 27609

with a copy to:   American Welding & Gas, Inc.
            Attn: General Counsel
            4900 Falls of Neuse, Suite 150
            Raleigh, North Carolina 27609

Either party may change his/its address for purpose of receipt of any such communication by giving ten day's written notice of such change to the other party in the manner provided above.

SECTION 12.8   <u>Sales and Transfer Taxes</u>.   All sales, use and transfer taxes arising out of the sale or transfer of the Purchased Assets hereunder shall be paid by Purchaser.

SECTION 12.9   <u>Tax Cooperation; Access to Records</u>.   Each party to shall, at the sole cost and expense of the requesting party, provide the other party with such assistance as may reasonably be requested by such other party in connection with the preparation of any tax return, any audit or other examination by any taxing authority, and any judicial or administrative proceedings relating to liability for taxes attributable to the Purchased Assets or the Business. Purchaser shall provide to Seller and its agents such reasonable access to or copies of the books and records of the Purchased Assets transferred to Purchaser pursuant to this Agreement, upon

reasonable notice and during normal business hours, as Seller may reasonably request in connection with any tax matters or other reasonable business purpose.

SECTION 12.10  **[Intentionally left blank.]**

SECTION 12.11   Strict Construction.  The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction shall be applied against either party.

SECTION 12.12   Voluntary Execution.  Purchaser, Seller and Stockholder represent that this Agreement has been carefully read, the contents and consequences thereof are known and understood, and their respective execution of same is voluntary and with informed consent. Both parties acknowledge to be represented by legal counsel.

SECTION 12.13   Benefits and Binding Effect.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

SECTION 12.14   Assignability.  This Agreement shall not be assignable by Seller or Stockholder without the prior written consent of Purchaser.  Purchaser may assign this Agreement to a subsidiary, division or affiliate of Purchaser.

SECTION 12.15   Trade Name(s).  After Closing, Seller and Shareholder shall discontinue the use of the business trade name, and all derivatives thereof, except as provided in this Agreement.

SECTION 12.16   Further Assurances.  The parties shall execute such further documents, and perform such further acts, as may be necessary to transfer and convey the Purchased Assets to Purchaser, on the terms herein contained, and to otherwise comply with the terms of this Agreement and consummate the transaction contemplated hereby.

SECTION 12.17   Default.  If, after the date of execution of this Agreement, a party (the "defaulting party") fails to perform any of the covenants, conditions, or agreements contained herein which are to be performed by the defaulting party, or if any of the representations and warranties made by the defaulting party as set forth in this Agreement are determined to be false or there is an adverse change in the Business (financial or otherwise), then the other parties (the "non-defaulting party") may elect to enforce any remedy available to the non-defaulting party at law or equity, without a bond, including, without limitation the remedy of specific performance or terminating this Agreement without any further liability or obligation to the defaulting party.

SECTION 12.18   Entire Agreement; No Oral Change.  This Agreement, together with the schedules and exhibits hereto and the other agreements referred to herein or executed in connection herewith, including, without limitation, the Confidentiality Agreement, embodies the entire agreement between the parties and supersedes any and all prior agreements, understandings or representations (written or oral) by or between the parties to the extent they relate in any way to the subject matter hereof.  The parties hereto expressly acknowledge and agree that Seller makes no representations and warranties as to any information previously provided to Purchaser by Seller in connection with this Agreement other than as expressly set

forth in this Agreement.  This Agreement may only be changed by written instrument signed by the party to be charged.

SECTION 12.19   Exhibit and Schedules.   Exhibits and schedules referred to in this Agreement are hereby made a part hereof.

SECTION 12.20   Facsimile and Electronic Signatures and Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original for all purposes, and together shall constitute one and the same consent notwithstanding that all parties are not signatory to the same counterpart.  The delivery of copies of this Agreement and of signature pages by electronic mail or facsimile transmission shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes.  Signatures of the parties transmitted by electronic mail or facsimile shall be deemed to be their original signatures for all purposes.

SECTION 12.21   Authority.   The parties signing this Agreement, the exhibits and schedules attached hereto and any and all other documents necessary to accomplish the transactions contemplated by this Agreement (collectively the "Transfer Documents") represent and warrant that they are duly authorized to enter into and sign such Transfer Documents and bind themselves and their respective corporations, principals, agents, successors and assigns to the Transfer Documents.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**ARC WELDING SUPPLY CO., INC.**


By: _Charles R. Mc Cormick, Pres_
    Charles R. McCormick
    President


**STOCKHOLDER OF**
**ARC WELDING SUPPLY CO., INC.:**


_Charles R. Mc Cormick_
Charles R. McCormick, Stockholder

**AMERICAN WELDING & GAS, INC.**


By: _Ronald C. Adkins_
    Ronald C. Adkins
    President

23