| | | |
|---|---|---|
| ARC WELDING SUPPLY CO., INC. An Illinois Corporation, CHARLES R. MCCORMICK, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | 3:16-cv-00173-RLY-MPB |
| | ) | |
| vs. | ) | |
| | ) | |
| AMERICAN WELDING & GAS, INC. A North Carolina Corporation, | ) ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON DEFENDANT'S COUNTERCLAIMS, AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT**

In October 2014, Defendant, American Welding & Gas, Inc. ("AWG"), entered into an Asset Purchase Agreement ("APA" or "Agreement") with the Plaintiffs herein, ARC Welding Supply Co. ("ARC") and Charles McCormick (collectively "Plaintiffs"). After the parties were unable to come to terms with the amount, if any, owed for the purchase of Plaintiffs' asset cylinders, Plaintiffs filed a Complaint alleging that AWG breached the terms of the Agreement, and owes them monetary damages. AWG, in turn, filed a counterclaim for (1) breach of contract, (2) unjust enrichment, (3) breach of warranty, (4) fraud, (5) negligent misrepresentation, and (6) breach of good faith and fair dealing. The parties now move for summary judgment. For the reasons that follow, the court **GRANTS in part** and **DENIES** in part Defendant's Cross Motion for Summary

Judgment, **DENIES** Plaintiffs' Motion for Summary Judgment, and **GRANTS** Plaintiffs'

Motion for Summary Judgment on Defendant's Counterclaims.

## I.    Background

Prior to October 1, 2014, ARC was a distributor of compressed gases and welding

supplies in Vincennes, Indiana.  ARC is, and has always been, owned entirely by Plaintiff

Charles ("Buck") McCormick.  (Filing No. 31, Affidavit of Charles McCormick

("McCormick Aff.") ¶¶ 5-6).  On October 1, 2014, ARC sold substantially all of its assets

to Defendant American Welding & Gas ("AWG"), which took over ARC's Vincennes

operation.  (*Id.* at ¶¶ 10-14).  In total, AWG paid ARC and McCormick over $1,500,000

for ARC's assets.   (Filing No. 47-1, Deposition of Charles McCormick ("McCormick

Dep.") at 8-9, and Ex. 1 thereto).  AWG also hired McCormick to manage its Vincennes

location, which he did for the following year.  (*Id.* at 9-10).

### A.    The Purchase and Audit of Asset Cylinders

One of the primary assets AWG purchased from ARC was its stock of "asset

cylinders."  (Filing No. 47-2, Affidavit of Ron Adkins ("Adkins Aff.") ¶ 7).  A company

like AWG or ARC makes its money by renting these cylinders to businesses who need

compressed gas for use in their operations.  (*Id.*).  For example, a restaurant or

convenience store may rent carbon dioxide cylinders from AWG for its soda fountains

and have them refilled on a regular basis by AWG.  (*Id.*).

Accordingly, when AWG and ARC were negotiating the sale of ARC's assets to

AWG, a critical fact was the number of asset cylinders that would be transferred.  (*Id.* ¶

8; McCormick Dep. at 11-12, 16).  McCormick represented that ARC owned, and would

transfer, "approximately 6,500" asset cylinders to AWG as part of the deal. (McCormick Dep. at 11; Filing No. 47-3, APA, Art. 2, § 2.1(f) and Schedule 1.1(a)). The purchase price was set, in part, on that representation. (McCormick Dep. at 11). At the time of the closing, however, the parties did not know the precise count of cylinders ARC would transfer because many cylinders were "out in the field" with customers. Consequently, pursuant to the APA, AWG held back $150,000—known as the "Cylinder Deferred Payment"— for 180 days to protect against a marginal shortage of up to 1,200 cylinders (1,200 x $125 = $150,000). (APA, Art. 2, § 2.1(f)). In AWG's experience, this 1,200 cylinder cushion was more than sufficient to protect against any shortage that might occur, and Plaintiffs said and did nothing to dissuade AWG of this belief. (Adkins Aff. 13).

AWG conducted the cylinder audit between October 1, 2014 and May 22, 2015. (*Id.* ¶ 15). The audit was supervised by Ron Adkins, AWG's President and Chief Executive Officer at the time. (*Id.* at ¶¶ 1, 16; McCormick Dep. at 39). The audit started with an in person physical count of the "dock stock" by AWG employees Rick Hersick and Fred Seminik. (Adkins Aff. ¶ 17; McCormick Dep. at 28-29). The "dock stock" consisted of the cylinders on-site at the Vincennes facility that AWG purchased from ARC. (*Id.*). That count yielded 1,553 cylinders. (Adkins Aff. ¶ 17).

AWG then audited the cylinders that were out "in the field" with the 1,233 customers whose accounts were transferred from ARC to AWG. (*Id.* ¶ 18). To do this, AWG first reviewed each customer's payment history. (*Id.*). If the records showed the customer consistently paid rent on a certain number of cylinders, and there were not a

large number of exchanges, AWG provided full credit for that number and would generally not visit the customer to confirm the count. (*Id.*). If, however, there were a large number of cylinder exchanges or abnormalities in the records provided by ARC, AWG would perform a physical audit whereby an AWG representative would actually visit the customer's location, meet with the customer, locate the cylinders, and record the number on cylinder reconciliation forms, which the customer would then confirm by signing. (*Id.*).

Some of the cylinders transferred from ARC to AWG were "in the field" pursuant to 99-year leases with customers. (*Id.* at ¶ 19). In those situations, AWG would send a letter to the customer seeking verification of the count listed in ARC's records. (*Id.*). Many of the customers provided the verification, and when that was done, AWG would provide full credit to ARC. (*Id.*). If there was a discrepancy between the records and the customers' count, or if the customer did not respond, AWG would follow up and often would perform an in-person audit.[1] (*Id.*).

After October 1, 2014, AWG started sending monthly cylinder rent bills to all of the customers it acquired from ARC. (*Id.* ¶ 23). These billings revealed that a significant percentage of ARC's customers were "no rent" customers, meaning the customers did not actually pay rent to ARC on the ARC-owned cylinders they were using, but instead only paid to have them refilled. (*Id.*). Under the APA, ARC's "no rent" cylinders were not

---

[1] Although McCormick was an AWG employee and the manager of the Vincennes location during the audit, he never once visited a customer to count cylinders despite being asked to do so by AWG. (McCormick Dep. at 26, 40).

considered "asset cylinders" to be included in the count unless those cylinders were retrieved. (APA, Art. 1, § 1.1(a) and Art. 2, § 2.1(f)).

The APA provided that settlement of the Cylinder Deferred Payment was to occur on or before April 15, 2015. (APA, Art. 2, § 2.1(f)). Adkins informed McCormick that the audit was taking longer than anticipated. (McCormick Dep. at 25). Adkins told McCormick that it looked like the count was going to come up short of the 6,500 cylinders, but that AWG wanted to continue counting in order to find every available cylinder. (Adkins Aff. ¶ 30). The parties dispute[2] whether McCormick orally consented to the continued audit and resulting delay in settlement. Adkins testified that McCormick consented. (*Id.* ¶ 32). McCormick says he did not. (McCormick Dep. at 25).

AWG finished the audit on May 22, 2015. (Adkins Aff. ¶ 33). It tallied up the "in the field" count on a 29-page spreadsheet that listed the count for each and every one of the 1,233 customers. (*Id.*). In sum, AWG's audit represented that ARC owned and transferred 4,663 asset cylinders to AWG—1,837 cylinders short of the 6,500 promised in the APA. (*Id.*).

**B.     Dispute Over Cylinder Audit**

Immediately before the parties entered into the APA, McCormick claims he gave AWG documentation showing ARC owned somewhere between 6,000 and 6,700 asset cylinders. (*See* McCormick Dep. at 18).

---

[2] This is the only dispute of fact.

After learning of the cylinder deficiency claimed by AWG, McCormick instructed Plaintiffs' accountant, Elisha Sterling, to contact AWG on June 9, 2015 and discuss the dispute. (Filing No. 47-7, Deposition of Elisha Sterling at 9-10). Sterling relayed to AWG that McCormick "says there may be a shortage" but believed that "a shortage of 1,837 is unlikely." (*Id.* at 13; Adkins Aff. ¶¶ 37-38).

After AWG's audit, 16 cylinders were discovered at Landree Mine which were not counted. (McCormick Dep. at 45-16). Beyond that, Plaintiffs admit that they have no evidence that the counts at any of the 1,232 other customers were flawed.

> Q:     Do you know of any other examples other than the Landree Mine of situations where additional cylinders were found at a customer after May of 2015?
>
> A:     No.

(*Id.* at 46).

### C.     The Purchase and Audit of Receivables

AWG also purchased ARC's accounts receivables as part of the October 1, 2014 sale of assets. (APA, Art. 2, § 2.1(a)). The parties agreed to defer 20% of the payment for receivables for 100 days, so that determinations could be made as to precisely which receivables were performing, and thus being purchased, and which were not. (*Id.*).

There is no dispute over receivables. AWG admits it owes ARC $43,859.48 due to the post-closing reconciliation of receivables.

## II.     Discussion

There are three motions before the court. The first of these is Plaintiffs' Motion for Summary Judgment on their breach of contract (the APA) and attorneys' fees claims.

They seek three specific damage awards for AWG's alleged breach of the APA: (1) the receivables holdback of $43,859.48; (2) the entire $150,000 Cylinder Deferred Payment; and (3) attorneys' fees. The second is Plaintiffs' Motion for Summary Judgment on Defendant's Counterclaims. This motion does not address all six counterclaims; instead, it addresses Counts II, IV, V, and VI of AWG's Counterclaim for unjust enrichment, fraud, negligent misrepresentation, and breach of the duty of good faith and fair dealing. Lastly, AWG filed a Cross-Motion for Summary Judgment on Plaintiffs' breach of contract and attorneys' fees claims and on Counts I and III of its Counterclaim for breach of contract and breach of warranty. AWG asks the court to award it $79,625 in damages for the asset cylinder shortfall (offset by the $43,859.48 it owes Plaintiffs on the receivables). The court begins with Plaintiffs' breach of contract claim.

### A. Breach of Contract

As this is a diversity case filed in the State of Indiana, Indiana rules of contract interpretation control. *Hinc v. Lime-O-Sol Co.*, 382 F.3d 716, 719 (7th Cir. 2004). Under Indiana law, the interpretation of a contract is a question of law for the court. *AM General LLC v. Armour*, 46 N.E.3d 436, 440 (Ind. 2015). In interpreting an unambiguous contract, the court must give effect to the intentions of the parties as expressed in the four corners of the document. *Id.* "Clear, plain, unambiguous terms are conclusive of that intent." *Art Country Squire, L.L.C. v. Inland Mortg. Corp.*, 745 N.E.2d 885, 889 (Ind. Ct. App. 2001). The meaning of a contract is to be determined from an examination of all of its provisions, not merely from a review of individual words, phrases, or paragraphs read in isolation. *Id.*

A "contract term is not ambiguous merely because the parties disagree about the term's meaning." *Roy A. Miller & Sons, Inc. v. Industrial Hardwoods Corp.*, 775 N.E.2d 1168, 1173 (Ind. Ct. App. 2002). Rather, a contract is ambiguous if its terms are susceptible to more than one reasonable interpretation. *Trustees of Indiana Univ. v. Cohen*, 910 N.E.2d 251, 257 (Ind. Ct. App. 2009). Ambiguous terms must be resolved by a trier of fact. *Arrotin Plastic Materials of Ind. v. Wilmington Paper Corp.*, 865 N.E.2d 1039, 1041 (Ind. Ct. App. 2007).

### 1. Plaintiffs' Breach of Contract Claim

Plaintiffs allege AWG breached the APA by failing to provide a proposed settlement within the time allotted under the APA; therefore, they argue, they are entitled to the entire Cylinder Deferred Payment of $150,000.

Article 2, Section 2.1(f) governs this issue, and states in relevant part:

Asset Cylinders. The Asset Cylinders in the possession of Seller and in possession of customers shall be counted and verified as part of the inventory under Section 2.1(e) above. The base number of Asset Cylinders is 6,500 units. The parties agree that the Asset Cylinders will not be verified to the satisfaction of the Purchaser prior to Closing, therefore, $150,000.00 of the Purchase Price shall be deferred for 180 days (the "Cylinder Deferred Payment"). After the 180 cylinder reconciliation period, any shortage of Asset Cylinders shall be charged at the rate of $125.00 per unit against the Cylinder Deferred Payment, and any excess of Asset Cylinders will be added at the rate of $125.00 per unit to the Cylinder Deferred Payment. The balance of the Cylinder Deferred Payment, if any, shall be paid to the Seller plus interest at **4% per annum** from the Effective Date to date of settlement. Settlement of the Cylinder Deferred Payment shall take place not more than fifteen (15) days following the end of the cylinder reconciliation period. For all accounts that indicate rental is not being paid, the related cylinders shall be excluded from the Asset Cylinders schedule. All steel, type E, type D and type M6 cylinders shall be excluded from the Asset Cylinder count beyond what is rented or in use (valued at $35.00).

The apparent purpose of the 180-day deadline (March 30, 2015) was to ensure that if Plaintiffs delivered enough cylinders to warrant recovery of some or all of the Cylinder Deferred Payment, they would receive payment by that deadline. Thus, if Plaintiffs delivered 5,300 cylinders—1,200 fewer cylinders than the 6,500 base number—they would not be entitled to any of the $150,000 deferred payment (1,200 cylinders x $125 = $150,000). However, if Plaintiffs delivered 6,500 cylinders, they would be entitled to $150,000 plus interest at 4% per annum starting from October 1, 2014.

The terms of Section 2.1(f) do not contemplate settlement beyond April 14, 2015. AWG maintains that McCormick, on behalf of ARC, orally extended the deadline for settlement. McCormick claims that any extension of the audit deadline could only be extended by written agreement pursuant to Article 12, Section 12.18 of the APA[3], which provides for modification of the Agreement only by written instrument, and Section 2-209 of the Uniform Commercial Code ("UCC") because the "portion" of the contract at issue relates to the sale of goods (cylinders).

The Sales chapter of the Indiana UCC applies to the sale of goods. Ind. Code § 26-1-2. "Goods" is defined as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale." Ind. Code § 26-1-2-105(1). Where the contract involves both the sale of goods and non-goods, the court employs the predominant thrust test. *Insul-Mark Midwest, Inc. v. Modern Materials,*

---

[3] Section 12.18 provides, in relevant part: "This Agreement may only be changed by written instrument signed by the party to be charged."

*Inc.*, 612 N.E.2d 550, 554 (Ind. 1993). Under that test, the court asks whether the contract predominantly involves the sale of goods, and, if so, the entire contract is subject to the UCC. *Id.* The court does not carve out a portion of the contract and determine if it involves the sale of goods, as argued by Plaintiffs. *Id.* In making this determination, the court looks to the language of the contract, the circumstances of the parties, and the primary reason they entered into the contract. *Id.* at 555.

The primary purpose of the APA was not merely the sale of goods, but the sale of a business with all of its tangible and intangible assets, including ARC's asset cylinders, machinery, equipment, inventory, vehicles, and trucks. The APA also provided for ARC's customer lists, leasehold interests, warranties covering the purchased assets, permits, receivables, contracts with ARC's customers, and ARC's name. (APA, Art. 1, § 1.1). In sum, the sale of goods, such as ARC's asset cylinders, was just one part of a complex agreement for the transfer of ARC's business to AWG. Therefore, the court finds the primary thrust of the APA was not the sale of goods. Indiana common law applies.

Under Indiana common law, "no oral modification" clauses can be orally modified. *Ambrose v. Dalton Const., Inc.*, 44 N.E.3d 707, 714 (Ind. Ct. App. 2015). The question of whether a contract was modified is a question of fact. *Id.*; *Gilliana v. Paniaguas*, 708 N.E.2d 895, 897 (Ind. Ct. App. 1999) (citing *Skweres v. Diamond Craft Co.*, 512 N.E.2d 217, 220-21 (Ind. Ct. App. 1987)).

In support of its argument that McCormick orally extended the settlement deadline, AWG directs the court to his deposition testimony, which reads, in relevant part:

Q:     Did you agree to extend that deadline orally?

A:     I do not remember.

Q:     So it's possible?

A:     It's possible.

Q:     Isn't it true that before April 15, 2015, you are aware that the audit was running behind, wasn't going to be finished by April 15, 2015?

A:     Yes.

Q:     And Ron Adkins and Rick Hersick had made you aware of that fact?

A:     I think I made them aware of it.

Q:     What did you say to them?

A:     I said that they wasn't going to get the audit done on time by the language of the Contract, and the Contract can only be changed in writing, not by my agreement of any verbal statement to them.

Q:     You told them that?

A:     Yes.

Q:     And what did they say?

A:     They - - they went ahead with the audit.

Q:     And when you say "went ahead," you mean they continued to do the audit?

A:     Yes.

Q:     And you didn't object, did you?

A:     No.

Q:     Because the more cylinders that were found, the better for you, correct?

A:     I guess.  By the wording of the contract.

(*Id.* at 25-26).

McCormick's testimony reflects that although he may not have unequivocally given his consent to an extension through his words, a reasonable jury could conclude that he did so with his conduct.  *Skweres*, 512 N.E.2d at 220-21 (noting a party may amend a contract, even one providing that any modification thereof must in writing, through the party's conduct).  McCormick testified that he did not object to AWG's continuation of the audit past the April 15 deadline, and never complained to anyone that the audit would be completed late.  (McCormick Dep. at 26 ("Q: Did you complain in any way to anyone that the audit was going to be done late?  A: No.")).  Indeed, an extension would be mutually beneficial:  AWG would have more cylinders upon which to earn money, and, in turn, "the more cylinders that were found, the better for [Plaintiffs]." (*Id.*).  The court therefore finds an issue of fact as to whether McCormick orally extended the deadline for settlement.  Plaintiffs' Motion for Summary Judgment on their breach of contract claim is **DENIED**, and AWG's Motion for Summary Judgment on Plaintiffs' breach of contract claim is **DENIED**.

### 2.     AWG's Counterclaim for Breach of Contract

In Count I of AWG's Counterclaim, AWG alleges Plaintiffs breached the APA by delivering only 4,663 asset cylinders.  For this alleged breach, they seek $229,625 (1,837

12

x $125 = $229,625)—$79,625 more than the $150,000 Cylinder Deferred Payment.

(Filing No. 47-5, Accounts Receivable and Cylinder True-Up).

As the court understands Section 2.01, the entire purchase price of the fixed assets and asset cylinders was $603,905.00. (APA, Art. 1, § 2.01(e)). As previously discussed, because the precise number of asset cylinders could not be accounted for as of October 1, 2014, the parties agreed that $150,000 of the purchase price would be deferred for 180 days (the Cylinder Deferred Payment). Any shortage of asset cylinders would be charged at the rate of $125.00 per unit *against* the Cylinder Deferred Payment, and any excess would be added at the rate of $125.00 per unit to the Cylinder Deferred Payment. (APA, Art. 2, § 2.01(f)).

The parties disagree over the correct interpretation of the phrase "against the Cylinder Deferred Payment." Plaintiffs contend the Cylinder Deferred Payment was intended to serve as a cap on recovery for any shortage, even a shortage of more than 1,200 cylinders. AWG contends the $150,000 Cylinder Deferred Payment was meant to provide instant relief for any shortage of up to 1,200 cylinders, but was never intended to serve as a limit on its damages.

The issue presented is difficult because Section 2.01(f) does not contemplate what occurred here—a shortage of *more than* 1,200 cylinders. It is undisputed that the parties bargained for a 1,200 cylinder cushion (1,200 x $125 = $150,000). Under Plaintiffs' interpretation, if they were to deliver 0 cylinders to AWG, they would only be out $150,000 even though AWG paid for 5,300. Under AWG's interpretation, if Plaintiffs were to deliver 0 cylinders, they would be entitled to $812,500 (6,500 x $125 =

13

$825,000)—over $210,000 *more* than the purchase price of both the cylinders *and* fixed assets. Both interpretations are reasonable based upon the terms of Section 2.01(f), but neither comports with the parties' intentions.

Furthermore, the actual value of each cylinder is not known. Although Section 2.01(f) provides for a $125 value per cylinder above 5,300, AWG admits that the cylinders are not all worth $125. In fact, it noted that certain cylinders were worth far more than $125. (Filing No. 47, Combined Response and Cross Motion for Summary Judgment at 8) (indicating 14 cylinders were each worth $125 under the contract, but were actually worth $1,200)). Therefore, the value of the cylinders delivered under the 5,300 threshold number (5,300-4,663 = 637) must be determined by a trier of fact. AWG's Cross-Motion for Summary Judgment on its Counterclaim is **DENIED**.

### 3. Attorneys' Fees

Plaintiffs seeks their attorneys' fees under Article 10, Section 10.2 of the APA. Plaintiffs' claim fails for two reasons. First, they are not prevailing parties. Second, Section 10.2, entitled "Indemnification," concerns the parties' duties to indemnify each other against claims filed by third parties. Therefore, Plaintiffs' Motion for Summary Judgment on this claim is **DENIED** and Defendant's Cross-Motion for Summary Judgment is **GRANTED**.

### B. AWG's Counterclaim for Breach of Warranty

In Count III of its Counterclaim, AWG alleges Plaintiffs breached their warranty to provide "approximately" 6,500 asset cylinders. Under Indiana law, to prevail on a breach of warranty claim, the plaintiffs must show (1) the existence of a warranty; (2)

14

breach of that warranty; and (3) the breach was the proximate cause of the injury. *Irmscher Suppliers, Inc. v. Schuler*, 909 N.E.2d 1040, 1048 (Ind. Ct. App. 2009). The parties dispute whether McCormick's representation that AWG owned, and would transfer, "approximately 6,500" asset cylinders constituted an express warranty.

An express warranty is an affirmation of fact or promise by the seller to the buyer that relates to the goods and becomes a basis of the bargain. *Martin Rispens & Son v. Hall Farms, Inc.*, 621 N.E.2d 1078, 1082 (Ind. 1993), *abrogated on other grounds*, *Hyundai Motor Am., Inc. v. Goodin*, 822 N.E.2d 947 (Ind. 2005); *Carpetland U.S.A. v. Payne*, 536 N.E.2d 306, 308 (Ind. Ct. App. 1989) (quoting Ind. Code § 26-1-2-313). By contrast, statements of the seller's opinion, "to the effect that goods are 'the best,' or are of 'good quality,' or will 'last a lifetime' and be 'in perfect condition,' are generally not regarded as expressions of the seller's opinion or 'the puffing of wares' and do not create an express warranty.'" *Royal Bus. Mach., Inc. v. Lorraine Corp.*, 633 F.2d 34, 42 (7th Cir. 1980) (internal citations omitted); *Corwin v. Conn. Valley Arms, Inc.*, 74 F. Supp. 3d 883, 892 (N.D. Ill. 2014) ("Opinions that a product is 'premium' or 'perfect' do not generally create express warranties.").

> The decisive test for whether a given representation is a warranty or merely an expression of the seller's opinion is whether the seller asserts a fact of which the buyer is ignorant or merely states an opinion or judgment on a matter of which the seller has no special knowledge and on which the buyer may be expected also to have an opinion and to exercise his judgment.

*Royal Business Mach.*, 633 F.2d at 41.

Plaintiffs argue McCormick's statements regarding the approximate number of asset cylinders owned by AWG was merely his opinion based upon the documentation he

possessed regarding the same showing anywhere from 6,000 to 6,700 cylinders. Thus, they claim, McCormick had no specialized knowledge on the issue. AWG retorts that Plaintiffs were the exclusive owners of the asset cylinders, and had exclusive access to, and control of, the records reflecting the number of cylinders they owned. Therefore, it argues, Plaintiffs had specialized knowledge as to the number of cylinders.

The court finds McCormick's representation to transfer an approximate number of asset cylinders does not constitute an express warranty because it is merely his estimate of the number of cylinders he and ARC owned. *See S. Surety Co. v. United States*, 75 Ct. Cl. 47, 67 (Ct. Cl. 1932) ("The naming of approximate quantities cannot be regarded in the nature of a warranty, but merely as an estimate of the probable amount, in reference to which good faith only can be required of the party making it."); *see also Dirico v. Fuqua Chrysler-Plymouth, Inc.*, 562 N.E.2d 756, 757-58 (Ind. Ct. App. 1990) (holding odometer certificate stating that "to the best of [the seller's] knowledge the odometer reading as stated above reflects the actual mileage of the vehicle" did not create an express warranty because it was a statement of the seller's state of mind). Maybe he *should have known* the number of cylinders they owned, but he did not. His inability to give a precise number is most likely the reason why the parties included a 1,200 cylinder cushion in Section 2.1(f) of the APA and required AWG to perform an audit of the same. Accordingly, Defendant's Cross-Motion for Summary Judgment is **DENIED**.

### C.    AWG's Tort Counterclaims

Plaintiffs move for summary judgment on AWG's counterclaims for unjust enrichment, fraud, negligent misrepresentation, and breach of the duty of good faith and

fair dealing under Indiana's economic loss doctrine. "The economic loss doctrine is a judicially created doctrine providing that a commercial purchaser of a product cannot recover from a manufacturer, under the tort theories of negligence or strict products liability, damages that are solely 'economic' in nature." *Daanen & Janssen, Inc. v. Cedarrapids, Inc.*, 573 N.W.2d 842, 844-45 (Wisc. 1998). *See also Thalheimer v. Halum*, 973 N.E.2d 1145, 1151 (Ind. Ct. App. 2012) ("Generally, the economic loss doctrine provides that where a contract exists, that 'contract is the only available remedy where the loss is solely economic in nature, as where the only claim of loss relates to the [service] or product's failure to live up to expectations, and in the absence of damage to other property or person.'" (quoting *Gunkel v. Renovations, Inc.*, 822 N.E.2d 150, 152 (Ind. 2005)); *Magic Circle Corp. v. Crowe Horwath, LLP*, 72 N.E.3d 919, 925 (Ind. Ct. App. 2017) (noting "the economic loss rule's general use" is to "bar[] liability [in] tort for a purely economic loss caused by a defendant's negligence"); *LaSalle Bank Nat'l Assoc. v. Paramont Props.*, 588 F. Supp. 2d 840, 851 (N.D. Ill. 2008) (noting the "doctrine bars recovery for improper performance (i.e., breach) of contract terms"); *Prime Leasing, Inc. v. Kendig*, 773 N.E.2d 84, 94 (Ill. Ct. App. 2002) (holding "tort law is not intended to compensate parties for monetary losses suffered as a result of duties which are owed to them simply as a result of a contract"); *Kailin v. Armstrong*, 643 N.W.2d 132, 144 (Wisc. Ct. App. 2002) ("When contractual expectations are frustrated because of a defect in the subject matter of the contract and the only damages are economic losses, the exclusive remedy lies in contract."). In *KB Home Indiana, Inc. v. Rockville TBD Corp.*, 928 N.E.2d 297, 304 (Ind. 2010), the Indiana Supreme Court, relying on Wisconsin law, observed:

[T]he principles underlying application of the economic loss doctrine to tort actions are "(1) to maintain the fundamental distinction between tort law and contract law; (2) protect commercial parties' freedom to allocate economic risk by contract; and (3) to encourage the party best situated to assess the risk [of] economic loss, the commercial purchaser, to assume, allocate, or insure against that risk."

*Id.* at 304 (quoting *1325 N. Van Buren, LLC v. T-3 Group, Ltd.*, 716 N.W.2d 822, 831 (Wisc. 2006)).

### 1.    Fraud

In Count IV of AWG's Counterclaim, it alleges Plaintiffs materially misrepresented the quantity of asset cylinders they owned, which induced it to accept Plaintiffs' offer for the purchase of its assets. Whether this claim is subject to the economic loss doctrine has not been addressed by an Indiana court. The court must therefore predict how the Indiana Supreme Court would decide this issue. *BMD Contractors, Inc. v. Fidelity and Deposit Co. of Maryland*, 679 F.3d 643, 648 (7th Cir. 2012).

Fraud is a tort, and is generally subject to the economic loss doctrine. *Digicorp, Inc. v. Ameritech Corp.*, 662 N.W.2d 652, 661 (Wisc. 2003). A narrow exception exists for fraud in the inducement claims, "but only when the claim is extraneous, rather than 'interwoven' with the subject matter of the contract." *Id.* at 662; *see also Huron Tool and Eng'g Co. v. Precision Consulting Servs., Inc.*, 532 N.W.2d 541, 545 (Mich. Ct. App. 1995).

In the present case, AWG primarily complains about the price it paid for the asset cylinders. (*See* Filing No. 33, AWG's Amended Counterclaim ¶ 47) ("Plaintiffs thus

fraudulently induced AWG to accept their offer as to the purchase price, close on the Agreement, purchase 6,500 asset cylinders from Plaintiffs, and pay for 6,500 asset cylinders per the Agreement's terms."). But this risk is interwoven with the parties' contract, at Section 2.01(f) of the APA, and is purely economic. *See Digicorp*, 662 N.W.2d at 663 (noting fraud involving matters for which risks and responsibilities were interwoven into the contract is not subject to the fraud in the inducement exception). The court therefore concludes that, were this case before the Indiana Supreme Court, it would find the economic loss rule applies to AWG's counterclaim for fraud in the inducement. Accordingly, Plaintiffs' motion for summary judgment on AWG's counterclaim for fraud in the inducement is **GRANTED**.

### 2. Negligent Misrepresentation

In Count V of AWG's Counterclaim, AWG alleges Plaintiffs negligently misrepresented the number of cylinders it owned, thereby inducing it to accept their offer to purchase ARC's assets. Indiana law does not recognize this tort outside of an employer-employee relationship. *Darst v. Ill. Farmers Ins. Co.*, 716 N.E.2d 579, 584 (Ind. Ct. App. 1999); *Ray Skillman Oldsmobile & GMC Truck, Inc. v. General Motors Corp.*, No. 1:05-cv-204-DFH-WTL, 2006 WL 694561, at *5 (S.D. Ind. March 14, 2006) (citing *Passmore v. Multi-Management Servs., Inc.*, 810 N.E.2d 1022, 1027-28 (Ind. 2004)). The rule of economic loss is thus inapplicable. Nevertheless, the court must **GRANT** Plaintiffs' motion because parties' relationship was not one of employer/employee.

### 3. Unjust enrichment

In Count II of AWG's Counterclaim, it alleges Plaintiffs owe them $79,625 due to the cylinder shortage, and have been unjustly enriched by their failure to reimburse them that amount. Unjust enrichment is a type of constructive contract "also referred to as quantum meruit, contract implied-in-law . . . or quasi-contract." *Zoeller v. East Chicago Second Century, Inc.*, 904 N.E.2d 213, 221 (Ind. 2009). Unjust enrichment is an equitable doctrine which permits recovery "where the circumstances are such that under the law of natural and immutable justice there should be a recovery." *Id.* at 220. It is not a tort. Therefore, the doctrine of economic loss does not apply.

Plaintiffs also argue AWG's claim for unjust enrichment cannot survive summary judgment because the parties' legal relations are defined by the APA. Plaintiffs are correct. "'When the rights of parties are controlled by an express contract, recovery cannot be based on a theory implied in law.'" *Id.* at 221 (quoting *Keystone Carbon Co. v. Black*, 599 N.E.2d 213, 216 (Ind. Ct. App. 1992)). Plaintiffs' motion for summary judgment on AWG's counterclaim for unjust enrichment is **GRANTED**.

### 4. Breach of Duty of Good Faith and Fair Dealing

Lastly, in Count VI, AWG alleges Plaintiffs owed it a duty of good faith and fair dealing under the parties' APA. "Indiana courts have recognized an implied covenant of good faith and fair dealing in contract law, but generally only in limited circumstances involving employment contracts and insurance contracts." *Allison v. Union Hosp., Inc.*, 883 N.E.2d 113, 123 (Ind. Ct. App. 2008); *see also McVay v. Store House Co.*, No. 1:16-cv-644-SEB-MJD, 2017 WL 676395, at * 6 (S.D. Ind. Feb. 21, 2017) ("Indiana law does not impose a generalized duty of good faith and fair dealing on parties to a contract,

absent special circumstances.").  The economic loss doctrine does not apply because this claim sounds in contract.  Nevertheless, the court must **GRANT** Plaintiffs' motion for summary judgment on AWG's breach of the implied covenant because there is no evidence of a special relationship between the parties.

## III.    Conclusion

For the reasons set forth above, the court **DENIES** Plaintiffs' Motion for Summary Judgment (Filing No. 28), **GRANTS** Plaintiffs' Motion for Summary Judgment on Defendant's Counterclaims (Filing No. 38), and **GRANTS in part** and **DENIES in part** Defendant's Cross-Motion for Summary Judgment (Filing No. 46). Specifically, the court **GRANTS** Defendant's Cross-Motion with respect to Plaintiff's claim for attorneys' fees, and **DENIES** Defendant's Cross-Motion with respect to Plaintiff's breach of contract claim, Defendant's breach of contract counterclaim, and Defendant's breach of warranty counterclaim.


**SO ORDERED** this 12th day of September 2017.


RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana


Distributed Electronically to Registered Counsel of Record.