UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| ARC WELDING SUPPLY CO., INC., an Illinois Corporation, and CHARLES R. MCCORMICK, | ) ) ) ) | |
| Plaintiffs, | ) ) | 3:16-cv-00173-RLY-MPB |
| vs. | ) ) | |
| AMERICAN WELDING & GAS, INC., a North Carolina Corporation, | ) ) ) | |
| Defendant. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

In October 2014, Defendant, American Welding & Gas, Inc. ("AWG"), entered into an Asset Purchase Agreement ("APA" or "Agreement") with the Plaintiffs herein, ARC Welding Supply Co. ("ARC") and its owner, Charles McCormick (collectively "Plaintiffs"). After the parties were unable to come to terms with the amount, if any, owed for the purchase of Plaintiffs' asset cylinders, Plaintiffs filed a complaint alleging that AWG breached the terms of the Agreement. AWG, in turn, filed a counterclaim for breach of contract.

The court held a bench trial on January 31, 2018. The parties also filed Proposed Findings of Fact and Conclusions of Law. Being duly advised, the court now enters its Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

# FINDINGS OF FACT

1. On October 1, 2014, Plaintiffs and AWG entered into the APA with AWG. (AWG Tr. Ex. 1, APA). As part of the transaction, AWG paid $1,534,796.06 for Arc Welding's assets. (*Id.* at 1).

2. AWG hired McCormick to manage its Vincennes location.

3. One of the primary assets of Arc Welding were its "asset cylinders."

4. The sales price was based in part on McCormick's representation that there would be approximately 6,500 cylinders.

5. At the time of the closing the parties did not know the precise count of cylinders ARC would transfer because many cylinders were "out in the field" with customers. Consequently, pursuant to the APA, AWG held back $150,000—known as the "Cylinder Deferred Payment"— for 180 days to protect against a marginal shortage of up to 1,200 cylinders (1,200 x $125 = $150,000). (APA, Art. 2, § 2.1(f)).

6. In AWG's experience, a 1,200 cylinder cushion was more than sufficient to protect against any shortage that might occur. (Trial Ex. 5, Affidavit of Ron Adkins ("Adkins Aff.") ¶ 12). Plaintiffs said and did nothing to dissuade AWG of this belief.

   **A.    Cylinder Audit**

7. AWG conducted the cylinder audit between mid-December, 2014 and May 22, 2015. (Plaintiff's Trial Ex. 4, Email between AWG's Todd Parke and Kevin

Adkins). The audit was supervised by Ron Adkins, AWG's President and Chief Executive Officer at the time. (Adkins Aff. ¶ 16).

8. The audit started with an in person physical count of the "dock stock" by AWG employees Rick Hersick and Fred Seminik. (*Id.* ¶ 17). The "dock stock" consisted of the cylinders on-site at the Vincennes facility that AWG purchased from ARC. (*Id.*). That count yielded 1,553 cylinders. (*Id.*).

9. AWG then audited the cylinders that were out "in the field" with the 1,233 customers whose accounts were transferred from ARC to AWG. (*Id.* ¶ 18). To do this, AWG first reviewed each customer's payment history. (*Id.*). If the records showed the customer consistently paid rent on a certain number of cylinders, and there were not a large number of exchanges, AWG provided full credit for that number and would generally not visit the customer to confirm the count. (*Id.*). If, however, there were a large number of cylinder exchanges or abnormalities in the records provided by ARC, AWG would perform a physical audit whereby an AWG representative would actually visit the customer's location, meet with the customer, locate the cylinders, and record the number on cylinder reconciliation forms, which the customer would then confirm by signing. (*Id.*).

10. Some of the cylinders transferred from ARC to AWG were "in the field" pursuant to 99-year leases with customers. (*Id.* at ¶ 19). In those situations, AWG would send a letter to the customer seeking verification of the count listed in ARC's records. (*Id.*). Many of the customers provided the verification, and when that was done, AWG would provide full credit to ARC. (*Id.*). If there was a discrepancy

between the records and the customers' count, or if the customer did not respond, AWG would follow up and often would perform an in-person audit. (*Id.*).

11. After the acquisition, AWG started sending monthly cylinder rent bills to all of the customers it acquired from ARC. These billings revealed that a significant percentage of ARC's customers were "no rent" customers, meaning the customers did not actually pay rent to ARC on the ARC-owned cylinders they were using, but instead only paid to have them refilled. (*Id.* ¶ 23). Under the APA, ARC's "no rent" cylinders were not considered "asset cylinders" to be included in the count unless those cylinders were retrieved. (APA, Art. 1, § 1.1(a) and Art. 2, § 2.1(f)).

12. The APA provided that settlement of the Cylinder Deferred Payment was to occur on or before April 15, 2015. (APA, Art. 2, § 2.1(f)).

13. Adkins informed McCormick that the audit was taking longer than anticipated.

14. Adkins told McCormick that it looked like the count was going to come up short of the 6,500 cylinders, but that AWG wanted to continue counting in order to find every available cylinder. (Adkins Aff. ¶ 30).

15. McCormick testified it was "possible" that he orally extended the deadline. In addition, on cross-examination at trial, he admitted he did not object to Adkin's request. McCormick testified that because AWG was Adkins' company, the decision to continue the audit was Adkins' decision, not his. Consequently, McCormick, through his words and actions, extended the deadline.

16. The extension granted by McCormick was mutually beneficial, as the more cylinders included in the final audit count, the more money AWG could earn and the smaller Plaintiffs' shortfall would be.

17. As a result of the extension, AWG did not miss the contractual deadline for completing the audit and proposing a "settlement" of the Cylinder Deferred Payment.

18. AWG finished the audit on May 22, 2015. (Adkins Aff. ¶ 33).

19. In sum, AWG's audit represented that ARC owned and transferred 4,663 asset cylinders to AWG—1,837 cylinders short of the 6,500 promised in the APA. (AWG Tr. Ex. 6, Spreadsheet at ecf pp. 11-42).

20. Plaintiffs claimed that after the audit was completed, 16 cylinders were discovered at Landree Mine. Beyond that, Plaintiffs offered no affirmative proof that the cylinder counts at any of Plaintiffs' customers were flawed.

21. AWG stipulated to provide a 16-cylinder credit to Plaintiffs.

   **B.  Accounts Receivables**

22. AWG also purchased ARC's accounts receivables as part of the October 1, 2014 sale of assets. (APA, Art. 2, § 2.1(a)). The parties agreed to defer 20% of the payment for receivables for 100 days, so that determinations could be made as to precisely which receivables were performing, and thus being purchased, and which were not. (*Id.*).

23. There is no dispute over receivables. AWG admits it owes ARC $43,859.48 due to the post-closing reconciliation of receivables.

## CONCLUSIONS OF LAW

1. To the extent any of the foregoing findings of fact is a conclusion of law, it is hereby adopted as a conclusion of law. To the extent any of the conclusions of law set forth below is a finding of fact, it is hereby adopted as a finding of fact.

2. The court has jurisdiction of this case pursuant to 28 U.S.C. § 1332.

3. This is a diversity case filed in the state of Indiana. Therefore, Indiana rules of contract interpretation control. *Hinc v. Lime-O-Sol Co.*, 382 F.3d 716, 719 (7th Cir. 2004).

4. Under Indiana law, the interpretation of a contract is a question of law for the court. *Holiday Hosp. Franchising, Inc. v. AMCO Ins. Co.*, 983 N.E.2d 574, 577 (Ind. 2013). In interpreting an unambiguous contract, the court must give effect to the intentions of the parties as expressed in the four corners of the document. *Art Country Squire, L.L.C. v. Inland Mortg. Corp.*, 745 N.E.2d 885, 889 (Ind. Ct. App. 2001). "Clear, plain, unambiguous terms are conclusive of that intent." *Id.* The meaning of a contract is to be determined from an examination of all of its provisions, not merely from a review of individual words, phrases, or paragraphs read in isolation. *Id.*

5. Article 2, Section 2.1(f) governs this issue, and states in relevant part:

Asset Cylinders. The Asset Cylinders in the possession of Seller and in possession of customers shall be counted and verified as part of the inventory under Section 2.1(e) above. The base number of Asset Cylinders is 6,500 units. The parties agree that the Asset Cylinders will not be verified to the satisfaction of the Purchaser prior to Closing, therefore, $150,000.00 of the Purchase Price shall be deferred for 180 days (the "Cylinder Deferred Payment"). After the 180 cylinder reconciliation period, any shortage of

Asset Cylinders shall be charged at the rate of $125.00 per unit against the Cylinder Deferred Payment, and any excess of Asset Cylinders will be added at the rate of $125.00 per unit to the Cylinder Deferred Payment. The balance of the Cylinder Deferred Payment, if any, shall be paid to the Seller plus interest at **4% per annum** from the Effective Date to date of settlement. Settlement of the Cylinder Deferred Payment shall take place not more than fifteen (15) days following the end of the cylinder reconciliation period. For all accounts that indicate rental is not being paid, the related cylinders shall be excluded from the Asset Cylinders schedule. All steel, type E, type D and type M6 cylinders shall be excluded from the Asset Cylinder count beyond what is rented or in use (valued at $35.00).

6. Both parties claim the other breached Section 2.1(f) of the APA.

7. Plaintiffs argue AWG breached the contract because they did not complete the audit within the 180-day reconciliation period. Therefore, they are entitled to the entire $150,000 Cylinder Deferred Payment.

8. Plaintiffs' claim fails for two reasons. First, AWG did not miss the deadline for proposing a settlement. McCormick extended that deadline through at least May 28, 2015, at which point AWG had completed its audit and proposed a "settlement" of the Cylinder Deferred Payment to Plaintiffs. (*See* AWG Tr. Ex. 6, Accounts Receivable and Cylinder True-up). Second, the purpose of the deadline "was to ensure that if Plaintiffs delivered enough cylinders to warrant recovery of some or all of the Cylinder Deferred Payment, they would receive payment by that deadline. If Plaintiffs delivered 5,300 cylinders—1,200 fewer than the 6,500 base number—they would not be entitled to any of the $150,000 deferred payment (1,200 cylinders x $125 = $150,000." (Filing No. 54, Entry at 9). Here, pursuant to AWG's audit, only 4,663 cylinders were accounted for—a number far less than 5,300. (*Id.*). Therefore, regardless of the deadline, Plaintiffs' failure to deliver

more than 5,300 cylinders means that they were never entitled to receive any portion of the $150,000 Cylinder Deferred Payment.

9. AWG, in turn, argues Plaintiffs breached Section 2.1(f) because the audit reflected that Arc Welding only owned 4,663 cylinders. AWG has proven its breach of contract counterclaim. Accordingly, AWG is entitled to (1) retain the entire $150,000 Cylinder Deferred Payment, and (2) recover $125 for each cylinder it did not receive under the 5,300 threshold.

10. AWG is entitled to be reimbursed for 637 cylinders it never received, minus the 16 cylinders from Landree mine. Accordingly, AWG is entitled to $77,625 in damages (621 x $125 = $77,625).

11. The amount Plaintiffs owe to AWG is offset by the $43,859.48 that AWG admits that it owes Plaintiffs in connection with the settlement of the accounts receivables. Accordingly, Plaintiffs owe AWG $33,765.52 ($77,625 - $43,859.48 = $33,765.52).

12. Pursuant to Section 2.1(f) of the APA, Plaintiffs owe AWG interest on their $33,765.52 debt to AWG at 4% per annum from the October 1, 2014 closing date until the date judgment is entered in this case. Plaintiffs are jointly and severally liable for this debt.

**SO ORDERED** this 27th day of February 2018.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.